Philip M. McKenna v. Commissioner.
McKenna v. Commissioner
Docket No. 4053.
United States Tax Court
1944 Tax Ct. Memo LEXIS 103; 3 T.C.M. (CCH) 1017; T.C.M. (RIA) 44312; September 29, 1944
*103 Family partnership: Validity. - On the authority of Robert P. Scherer, 3 T.C. 776, CCH Dec. 13,914, it is held that a partnership consisting of taxpayer, his wife and three children, his brother and his cousin was valid. Paul G. Rodewald, Esq., 1025 Union Tr. Bldg., Pittsburgh, Pa., for the petitioner. Richard L. Shook, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding seeks redetermination of deficiencies in petitioner's income tax of $67,011.76 and $415,543.77 for the years 1940 and 1941, respectively. The primary issue remaining for decision is whether the entire income of a business is taxable to petitioner, or whether parts thereof are attributable to various members of an alleged partnership. Findings of Fact The case was presented by stipulation of facts and evidence adduced at the hearing. Those facts stipulated are hereby found accordingly and facts hereinafter appearing which are not from the stipulation are facts found from the record. Petitioner is an individual residing at Latrobe, Westmoreland County, Pennsylvania. His 1940 and 1941 income tax returns were duly filed *104 with the collector at Pittsburgh. Petitioner is a metallurgical chemist who since 1912 has been engaged in research on cutting tool materials, having begun his training under his father, a pioneer in the manufacture of tool steels, and particularly tungsten steel. Petitioner's research on tool and metal ingredients and associated processes resulted in a patent issued to him at the age of 16 on a method of recovering cobalt from nickel ores and also later on methods of recovering tungsten from waste ores. In pursuit of these researches petitioner in 1928 became Chief Research Metallurgist of Vanadium Alloys Steel Company (hereinafter called Vanadium), of Latrobe, Pennsylvania, under a contract of employment entitling him to a 2 percent royalty on products of his inventions sold by Vanadium. While at Vanadium petitioner invented tool metal compositions, the production of which in 1932 was subcontracted by Vanadiaum to Fansteel Products Company of North Chicago (hereinafter called Fansteel), at whose plant petitioner conducted his research while directing the manufacture and sale of the product. In 1936 Vanadium and Fansteel formed a new corporation, Vascoloy-Ramet Corporation (hereinafter *105 called Vascoloy), of which Vanadium owned one-third and Fansteel two-thirds. In late 1937 petitioner was advised that Vanadium would not sell the products of his invention but that Vascoloy would do so without paying him any royalty. The "Kennametal" patents hereinafter referred to cover a cemented carbide composition, and the processes used in making it, formed of cobalt and carbides, including tungsten carbide and tungsten-titanium carbide, the latter being a new intermetallic compound of extreme hardness discovered by petitioner in 1937. The product is called Kennametal, a trade name, and is used as the cutting element in machine tools. None of these patents had been assigned to Vanadium, and the petitioner refused to assign them unless promised the 2 percent royalty. Vanadium refused to make such an arrangement and discharged its entire research staff. Petitioner on March 1, 1938, began his own business of producing Kennametal at Latrobe, Pennsylvania, which he conducted as a sole proprietorship until June 30, 1940, employing at the beginning six to eight former associates in Vanadium's research department. Vanadium claimed ownership of the Kennametal patents and after an *106 unsuccessful suit in the Pennsylvania State courts to restrain petitioner's use of the patents and require him to assign them to Vanadium, Vanadium brought suit against petitioner in the United States District Court at Pittsburgh, claiming the equitable ownership of the patents, alleging their infringement by petitioner, and praying an injunction and an accounting. This suit was settled by an agreement dated October 27, 1939, under which the petitioner assigned to Vanadium the legal title to Kennametal patents, Vanadium granting to petitioner, with right of assignment to successors of its entire cemented hard carbide business, a royalty-free license which was duly recorded. Vanadium agreed not to license any others than Vascoloy, General Electric Company, Carboloy Company, Inc., Fansteel Metallurgical Corporation, and Ramet Corporation of America, and these at a 2 percent royalty payable to the petitioner, except that the license to Vascoloy was to be royalty free. The Kennametal patents disclose fully and accurately the information necessary to enable skilled workmen and chemists to produce Kennametal successfully, and on June 30, 1940, the employees who could and did carry on such *107 manufacturing processes during long absences of petitioner were Kenneth Carroll, Alexander G. McKenna, William Newcomer, J. E. Newcomer, Harry Fowler, and Donald Schick. When petitioner began his own manufacturing business in 1938 he desired to form a partnership to include his principal employees formerly associated with him in the research department of Vanadium, together with his wife, Dorothy C. McKenna, his cousin Alexander G. McKenna, his brother Donald C. McKenna, and other relatives. On advice of counsel he postponed his decision until some of the patent questions had been cleared up. On June 28, 1940, petitioner transferred $12,000 to his cousin, Alexander G. McKenna, as trustee for his son Philip Collins McKenna who was then 15 years of age, $12,000 to Alexander G. McKenna, as trustee for his daughter Sydney Edith McKenna who was then 17 years of age; and $12,000 to Alexander G. McKenna, as trustee for his daughter Carol Elizabeth McKenna who was then 13 years of age, all in accordance with agreements of trust also dated June 28, 1940, and executed by petitioner and the trustee. The agreements of trust were identical in form except that the trust for Philip was to terminate *108 when he should reach the age of 21 years, while the trusts for each of the two daughters were to terminate upon their respectively reaching the age of 30 years. Each trust was by its terms irrevocable. Under the trust instruments the income is directed to be accumulated for the use and benefit of the beneficiaries named until they arrived at the age of 21 and thereafter, in the case of the daughters, to be distributed currently until they arrived at the age of 30, with the provision that any income invested in any partnership interest or share or retained by such partnership and not actually received by the trustee need not be distributed until the death of the grantor or the prior termination of the trust. Upon a beneficiary attaining the age of 30 years (21 years in case of the son) or his or her prior death, the trusts terminate and the trust estate goes to the intestate successors of the beneficiary, determined under Pennsylvania law. In each trust Donald C. McKenna, petitioner's brother, is appointed adviser and all investments, sales, and reinvestments of the corpus, accretions thereto and accumulations of income thereon must be authorized and directed in writing by the adviser, *109 who is given sole discretion in such matters. On June 29, 1940, petitioner, Alexander G. McKenna, Dorothy C. McKenna, Alexander G. McKenna, trustee for Sydney Edith McKenna, Alexander G. McKenna, trustee for Carol Elizabeth McKenna, Alexander G. McKenna, trustee for Philip Collins McKenna, and Donald C. McKenna executed and delivered an agreement entitled "Partnership Agreement of McKenna Metals Company," effective as of July 1, 1940. The agreement stated that the partnership name was to be "McKenna Metals Company," that the partnership was formed for the purpose "of conducting a business of making, manufacturing, producing, dealing in, selling, leasing, licensing and distributing machinery, tools and equipment made of or embodying hard cemented carbides or other cutting or abrasive material, including * * * the business heretofore conducted by Philip M. McKenna individually, * * * and for the purpose of conducting research experiments and development work * * *." The contributions of capital of the partnership were recited in the agreement to be as follows: (a) Cash contributions of the general
partners: Alexander G. McKenna
$ 9,600
Dorothy C. McKenna
16,800
Alexander G. McKenna, Trustee for
Sydney Edith McKenna
12,000
Alexander G. McKenna, Trustee for
Carol Elizabeth McKenna
12,000
Alexander G. McKenna, Trustee for
Philip Collins McKenna
12,000
(b) Cash contribution of limited partner: Donald C. McKenna
$ 9,600
(c) Contribution in property of Philip M.
McKenna, general partner: 40 percent of
the entire assets of the business conducted
by him in Latrobe except his license from
Vanadium-Alloy Steel Company "the value
of which business, exclusive of the said
license, is one hundred twenty thousand
dollars ($120,000)."
*110 It was provided that the contribution was to be made by having the partners pay petitioner $72,000 of the cash contributed by the other partners in return for a bill of sale by petitioner of the entire assets and business. The agreement further provided that general partners could receive salary in amounts and periods to be determined by the partners "contributing a majority of the capital contributions." and that the profits and losses of the business were to be shared as follows: Philip M. McKenna
40 percent
Alexander G. McKenna
8 percent
Dorothy C. McKenna
14 percent
Alexander G. McKenna, Trustee for
Sydney Edith McKenna
10 percent
Alexander G. McKenna, Trustee for
Carol Elizabeth McKenna
10 percent
Alexander G. McKenna, Trustee for
Philip Collins McKenna
10 percent
Donald C. McKenna
8 percent
It was also provided that profits were distributable only as determined by the general partners "who shall have full power and authority to retain any profits of the business of the partnership or to expend such profits for research and development expenses, for the expansion of the business, or for the acquisition of additional assets." All distributions were to be made *111 pro rata "and the interest of each partner in profits retained or expended * * * shall be in accordance with the above percentages but shall not be collectible by any partner until the partnership is terminated in the manner hereinafter provided." Petitioner was to devote his entire time and attention to the business. No general partner was to endorse any negotiable instrument or become liable as indemnitor, guarantor or surety either in his own name or in the name of the partnership without the consent of the other general partners. In all other partnership matters requiring a decision "each general partner shall have as many votes as his percentage of interest in the profits or losses * * * and a majority of the votes shall decide." Involuntary dissolution of the partnership was to take place upon the termination of any of the three trusts or the death, insanity or retirement of any partner, or upon the change in office of the trustee of the trusts. Voluntary dissolution might occur after written notice of a meeting at which partners having 75 percent interest in the profits are represented and by the vote of partners entitled to at least 75 percent of the profits. On dissolution *112 the owners of a majority in interest of the assets as a unit were given the right to purchase the interests of the other partners at a price equal to the book value determined upon the basis of a statement by a reputable firm of public accountants. This right was to be exercised within 60 days and the purchase price paid within six months. On such purchases on dissolution the former parties were to have their interests fixed by their capital contribution and the percentage of profits and losses to which he is entitled. "Good will," copyrights, and trade names were to be assigned no value. All the parties who executed the partnership agreement executed in the manner prescribed by Pennsylvania law a "Certificate of Limited Partnership of McKenna Metals Company," which on July 1, 1940, was duly recorded. Dorothy C. McKenna made the cash contribution of $16,800 provided for under the agreement by her check to McKenna Metals Company, dated July 1, 1940, drawn on her account with the First National Bank in Latrobe, Pennsylvania. The funds for the payment consisted of $4,000 given to her by petitioner on July 1, 1940, for this purpose and $12,800 borrowed by her upon her 6 percent note *113 from Donald McKenna, trustee for Eliza M. McKenna, petitioner's mother, under a revocable trust created by her for her own benefit. On January 7, 1941, Dorothy C. McKenna received an additional gift of $4,000 from the petitioner, and on that date she paid Donald McKenna $6,286, of which $384 was credited to interest upon her note and the remainder was credited to principal, leaving an unpaid balance of $6,916. On March 15, 1941, she paid him $2,268, of which $85.29 was credited to interest and the remainder to principal, leaving a balance of $4,733.23. On April 4, 1941, she borrowed $5,000 from her mother at a lower rate of interest and with this money she paid the remaining balance due on her note. The indebtedness to her mother was paid by her on May 17, 1941. Petitioner and Dorothy C. McKenna owned in their joint names a blueberry farm in New Jersey, a house in Latrobe, and the home in which they live. Alexander G. McKenna made the cash contribution of $9,600 provided for under the agreement by his check to McKenna Metals Company in that amount paid out of his own funds consisting of $4,600 of his own savings and $5,000 borrowed from his mother. Donald C. McKenna made the cash *114 contribution of $9,600 provided for under the agreement by his check to McKenna Metals Company paid out of his own funds. On July 1, 1940, Donald C. McKenna transferred to his wife, Bernice W. McKenna, a life interest in one-half of the income and distributive share of his 8 percent interest in McKenna Metals Company for which she paid him $5,000. No knowledge of this transaction came to any of the other parties to the partnership agreement until eight or nine months thereafter and no record was made upon the books of the McKenna Metals Company to show any interest of Bernice W. McKenna either in the capital of the business or its income. Alexander G. McKenna, as trustee for Sydney Edith McKenna, Carol Elizabeth McKenna, and Philip Collins McKenna respectively, made the cash contributions of $12,000 for each of the trusts provided for under the partnership agreement by checks drawn on separate accounts maintained by him for each of the trusts with the First National Bank in Latrobe, Pennsylvania. The moneys drawn consisted of moneys transferred to the trustee for this purpose by petitioner upon the creation of the respective trusts. Petitioner made the contribution provided for *115 under the trust agreement in the manner there provided, and a check of the McKenna Metals Company in the amount of $72,000 was delivered to him on July 1, 1940, and deposited by him in his own account. On or before March 15, 1941, petitioner filed his gift tax return for the calendar year 1940 in which he reported a gift of $4,000 to his wife and gifts of $12,000 each to Alexander G. McKenna, trustee for Sydney Edith McKenna, Carol Elizabeth McKenna and Philip Collins McKenna, respectively. Appropriate donee information returns for the year 1940 showing these amounts as gifts received from petitioner were duly filed. Under date of February 18, 1944, respondent mailed petitioner a notice of deficiency in gift tax for the year 1940, asserting a deficiency of $77,715 on the ground that the value of McKenna Metals Company as of June, 1940, was $1,000,000, and that the sale of the various interests in the partnership on the basis of a value of $120,000 was a transfer for less than a full and adequate consideration of money or moneys worth; and that the amounts transferred exceeded the consideration and were gifts. Appropriate entries were made upon the books of petitioner as sole proprietor *116 to reflect the sale to the other partners for $72,000 of a portion of his business and the reduction of his interest in the business to $48,000, which amount became the opening balance of his capital account on the partnership books. The opening entries on the partnership books appropriately showed the contributions to the partnership aggregating $72,000 made by the other partners which amounts were credited to their respective capital accounts. After the partnership was formed it paid salaries of $400 per month to petitioner and $200 and $250 per month to Alexander G. McKenna, which were in addition to their distributive shares of the partnership income. No other partner was paid a salary. Alexander G. McKenna was receiving a bonus prior to July 1, 1940, which for the first six months of 1940 was about $2,000 in addition to his salary of $200 per month. After the partnership was formed his bonus was discontinued. The books of the partnership appropriately showed the amount and dates and distribution of profits made to the several partners as well as the capital accounts of each of the partners, showing their drawings, the profits credited to their respective accounts and balances, *117 all in accordance with the percentages provided in the partnership agreement. Decisions as to the distributions were made by all the partners in consultaion and partnership checks were delivered to the individual partners for the proper share of the total distribution. Dorothy C. McKenna's viewpoint as to distributions was to permit the partners to withdraw a substantial part, if not all, of the periodic earnings. The partnership view which prevailed provided for distributions not greatly in excess of the amount needed by the respective partners other than petitioner for income tax purposes. During the period March 1, 1938 to December 31, 1938, gross sales of the products manufactured amounted to $30,690.84 with petitioner sustaining a net loss from his business of $1,030.25. The business grew in gross sales and in the number of employees. For 1939 the gross sales were $160,549.72 and the net profit $37,027.71. For the first six months of 1940 gross sales were $180,191.49 and net profits $59,421.95. Petitioner was aware of the potentially large profits which might result from a demand for his product caused by the European War. An interference was conducted in the United States *118 Patent Office between petitioner's application for one of the Kennametal patents and certain patents of applications of one Schwarzkopf, which in April of 1940 was dissolved, it being stated that the declaration of interference was inadvertent in view of the fact that Schwarzkopf had failed to file a statement showing how petitioner's claims would read upon his disclosure. Kennametal patents would have infringed the Schwarzkopf patents if the latter had been sustained. In early 1940 there was pending in the District Court of the United States for the Eastern District of Michigan patent litigation by General Electric Company and Carboloy Company against Willey's Carbide Tool Company and Industrial Diamond Company, involving the validity of Schroter patents held under license from Krupps. The court's decision against the validity of the Schroter patents was entered July 11, 1940. The Kennametal patents would have infringed the Schroter patents if the latter had been sustained and petitioner was so advised by his patent counsel in 1937. Under date of July 21, 1941, Canadian General Electric Company, Limited, addressed a letter to Kennametal of Canada, Ltd., Victoria, B.C., transmitting *119 a list of Canadian patents claimed to be infringed by Kennametal Company of Victoria in the manufacture of hard metal carbide material. Such patents corresponded to the Schroter patents involved in the American litigation and the patents under which Kennametal of Canada was operating were the Canadian patents corresponding to the Kennametal patents. By letter dated February 12, 1940, addressed to petitioner, the patent counsel for Firth-Sterling Steel Company claimed infringement by petitioner by his manufacture and sale of hard metal compositions under the Kennametal patents, of the so-called Comstock patents owned by Firth-Sterling Company. Petitioner's patent counsel by letter dated February 21, 1940, disavowed the infringement. In August, 1940, the trade was making inquiries of the partnership as to patent litigation with Firth-Sterling. The petitioner's patent counsel's opinion was that the Kennametal patents did not infringe the Comstock patents but the possibility that the court might hold otherwise was recognized. In the discussions leading to the making of the partnership agreement the patent infringement and interference claims and the Vanadium settlement were brought *120 to the attention of each of the prospective partners and were given weight in arriving at the price to be paid by them. Before the partnership agreement was signed its terms were fully discussed with the other partners whose views as to percentages, membership, price and other terms were given weight by petitioner and sometimes prevailed. Dorothy C. McKenna was the deciding factor in the choice of partners. By early 1940 petitioner's business had grown to the point where it was necessary to have personnel with authority to manage and make business decisions during petitioner's frequent absences on business trips. The number of employees had increased to approximately 50, but no one other than petitioner had authority to sign checks, make purchases, enter into contracts of sale, hire or discharge employees or otherwise assert authority during petitioner's absences. It was thought that the business had grown beyond the point where one can could conduct it properly as a single proprietor. These considerations were recognized and taken into account by petitioner and those who entered into the partnership agreement. Donald C. McKenna was not satisfied as to petitioner's ability to run *121 a large business, petitioner not having been successful with Vanadium and at Pomona Pump Company, the latter being a business operated by Donald C. McKenna in California. As late as June 30, 1940, the production of Kennametal had been conducted on a laboratory scale with research equipment in small high frequency induction furnaces. To obtain a lower cost of production petitioner and his prospective partners considered it necessary to make substantial capital investments in larger furnaces and other equipment. In May of 1940, petitioner ordered such a furnace and made other investments in equipment. The necessity for rapidly increasing capacity for larger scale production was emphasized by the unstable and dangerous price situation and the consequent risk of radical reductions in the price of competing cemented carbides. At this time the price of Kennametal was 45 cents per gram, or approximately $225 per pound, which price was comparable to the price of competing cemented carbides produced and sold by other concerns backed by large capital. It was known that the Federal Trade Commission was attacking the price structure under the anti-trust laws, and that a substantial drop in *122 price was to be expected at any time. Petitioner advised the others interested in the business that a 30 percent price reduction could be made without ruin to the business. The actual price reduction occurred in September, 1940, and was 60 percent, and successive later reductions in price have brought the price of Kennametal down to 5 cents per gram, an aggregate reduction of nearly 89 percent. It was the purpose of petitioner to reorganize and preserve the growing value of the business against the event of his illness or death so that experienced and responsible persons interested in the business might reorganize it and carry it on. Since 1938 when Alexander G. McKenna first began to work for petitioner, petitioner had from time to time promised that he would take him into the business upon some basis either as a partner or in a corporation through stock ownership. In reliance on this promise, Alexander G. McKenna continued to work for and with petitioner in the development of the business. He made valuable contributions to it and acquired training and experience in the conduct of the business. He was a qualified metallurgist, being one of the several men who at June 30, 1940, *123 had the skill and knowledge with which to make Kennametal successfully. Petitioner in 1940 desired to take into the partnership a large number of other persons, including several of his other employees and relatives, on equivalent terms. Petitioner desired to take in as partners Cleveland McKenna, his brother, who lived in California, William Newcomer, his superintendent, and Kenneth Carroll, his metallurgist. This was not carried out after discussion with the other parties who entered into the partnership agreement because of their objections. Dorothy C. McKenna objected the most strongly. Petitioner and Alexander G. McKenna favored the formation of a partnership as an advantageous form of conducting a business because of the favorable experience of members of his family, including his grandfather and his brothers, some of whom were minors, his father and his brothers, some of whom were minors, and his grandmother's cousin, Andrew Carnegie, whose partnership had more than 30 members. Donald C. McKenna strongly urged incorporation for business reasons. Petitioner was opposed to the formation of a corporation largely because of the inconvenience of registration in the various states *124 in which he was already doing business and expected to do business. Petitioner was convinced that he could earn more money as a partner than as a sole proprietor because of the increased business that he expected because he could act with greater energy and less fear of economic ruin if he had partners to share his business risk and to help manage the business. He felt that partners, rather than let the business go to ruin, would find additional capital to keep it going if necessary. The purpose of the petitioner in creating the trusts for his minor children was to make it possible to put them into the business by means of the trust and he anticipated that they, upon termination of their trusts, would become active partners in their own right. Philip Collins McKenna had been employed in the business during his spare time and had been promised ultimate participation. He had participated in the discussions relating to the terms of the proposed partnership. He was being trained in the metallurgical and research problems of the business. The schooling of the two daughters included courses selected as training for their ultimate participation in the business. Since 1938 petitioner had *125 held out to his wife the prospect of her becoming a partner. She took constant part in almost daily discussions of the problems of the business at home. Petitioner frequently brought business guests home for this purpose and discussions also took place with the employees who lived at petitioner's home. When petitioner suggested to his wife early in 1940 that he take in partners she insisted upon participation by reason of the attention she was already giving the business. Petitioner pointed out the need for capital and she undertook to raise some of the money for the purchase of her interest. When petitioner suggested bringing in their son, Phillip Collins McKenna, as a partner, his wife insisted upon equal participation for the two daughters. Through the period from March 1, 1938, to June 30, 1940, petitioner had almost daily correspondence with his brother, Donald C. McKenna, on the subject of his business, seeking and obtaining advice on business and financial matters, for which Donald C. McKenna was qualified by experience as executor of his father's estate and as a managing officer of Pomona Pump Company. Such advice was likewise obtained by petitioner on occasion of visits *126 by him to California and visits by Donald C. McKenna to Latrobe. For many years prior to June 30, 1940, the products of petitioner's inventions were tested under the supervision of Donald C. McKenna at Pomona Pump Company, and in this manner Donald C. McKenna had acquired considerable knowledge of petitioner's business. Donald C. McKenna offered to participate in a corporation in which he proposed to invest $50,000, or to lend the partnership $10,000 at 8 percent interest. He ultimately accepted petitioner's offer to participate in a partnership but insisted on becoming a limited partner in view of the many risks. For the protection of his limited liability and to see to it that they got a genuine partnership to control the business, he retained separate counsel at his own expense who participated for his protection in the preparation of the partnership agreement. Donald C. McKenna's expenses in this connection were disallowed as a deduction by the respondent as capital expenditures made in forming the partnership and the resulting deficiency was paid. The price of $120,000 on the basis of which the several interests were acquired by the parties to the agreement was arrived at after *127 full discussion by all the parties and represented the estimated book value of the business at June 30, 1940, on the basis of the April and May figures. Donald C. McKenna regarded the value as excessive and contended for a value of $100,000 in view of the risks to the business inhering in the pending patent controversies and the unnaturally high price level for the product. In August 1939, petitioner sold to Alexander Machine Company of Birmingham, England, the British patents corresponding to the Kennametal patents for the sum of $20,000 cash which price was the best bargain petitioner could get in view of the conflicting claims under other patents which he showed to the purchasers. Petitioner agreed to teach the purchasers' representatives the business. Accordingly, two of the Alexanders worked for some time in petitioner's business and in the partnership business, living at the home of petitioner and his wife. At the insistence of the other parties to the partnership agreement petitioner promised not thereafter to divulge business affairs to outsiders. In August 1940, petitioner transferred to Kennametal of Canada, Limited, a Canadian corporation, the Canadian patents corresponding *128 to the Kennametal patents for one-third of the common stock of Kennametal of Canada, Limited, the remaining two-thirds being issued to the Alexander interests for $40,000 cash. Under date of July 19, 1940, petitioner assigned to the partnership the royalty free license granted to him by Vanadium as part of the settlement of the litigation above mentioned in consideration for which the partnership undertook to pay petitioner the sum of $75,000 in semi-annual installments of $2,500 per year for 15 years, which installments were regularly paid at least through 1943. The price agreed to be paid to petitioner for this license was suggested by petitioner based upon the 2 percent royalty previously payable by Vanadium computed upon estimated annual sales of $250,000. This price was arrived at by discussion with all partners and took into account the prices at which petitioner had sold his British patents and was selling his Canadian patents, and the anticipated sales. Donald C. McKenna thought the price to be high in view of these considerations. In the discussion leading up to the formation of the partnership petitioner and the other parties to the agreement discussed and took into account *129 the above-mentioned matters and the price at which the several partnership interests were acquired, and the price for the license under the Kennametal patents was arrived at by the partners as the result of honest bargaining and represented their opinion at the time of the fair value of the assets involved. After the partnership agreement was entered into parties to the agreement participated and assumed responsibility as partners. All decisions of major importance were made in consultation with all partners and decisions of importance were made by partners other than petitioner and contrary to petitioner's views. After the partnership was formed Alexander G. McKenna for the first time had authority. He acted for himself and as trustee when dealing as a partner, and wrote checks on the partnership bank accounts, directed operations, decided strategy of the business, exercised authority of hiring and discharging, made contracts for the purchase of equipment and materials, set prices for the sale of products and made decisions for the general conduct of the business, both alone and in consultation with other partners. He showed great improvement as soon as he had responsibility. His *130 research resulted in valuable new processes. Dorothy C. McKenna did not work at the plant but attended to business mail not addressed to the plant. She sometimes signed the payroll and almost daily participated at home in long consultation on partnership matters with other partners, particularly petitioner and Alexander G. McKenna. She and petitioner discussed business together after the execution of the partnership agreement in much the same way as they did before. She insisted on her right as a partner in the making of partnership decisions. The views she expressed were given weight and her views and those of Alexander G. McKenna often prevailed over those of petitioner. Her advice and help were heeded, particularly in the selection of personnel, candidates for employment being brought to the home for that purpose. She found and purchased needed equipment. In the fall of 1940 she visited and conferred with Donald C. McKenna at the plant of Pomona Pump Company upon a variety of business problems. She inspected the Pomona Pump Company's plant and business procedures and caused corresponding changes to be made in Latrobe. She signed checks, delivered tools, and took part in decisions *131 as to profit distributions. After the partnership was formed Donald C. McKenna was in constant touch with the conduct of the business through correspondence with petitioner. He gave almost daily advice on business and financial matters. He selected lawyers and auditors. He participated in decisions in which his views were given weight. He visited the plant on several occasions in 1940 and 1941. He acted on behalf of the partnership to such an extent that he feared the loss of his status as a limited partner. The fact of the formation of the new partnership was communicated to outsiders, including petitioner's bank, where the account was transferred from his name to the name of McKenna Metals Company, a partnership, and each partner was given authority to withdraw funds. The change in status was also communicated to credit-rating agencies which published the facts. The amounts received by Dorothy C. McKenna as distributions were deposited in her own bank account. No part was expended or applied for the support, education or maintenance of any person to whom the petitioner owed any obligation of support. Petitioner at all times paid all household and other bills. Dorothy C. McKenna *132 did not account to anyone or advise anyone, including petitioner, exactly what she did with her distributions from the partnership. Alexander G. McKenna did not account to anyone for his partnership interests and distributions. The distributions were made ratably in accordance with his percentage interest, no part of which was expended for the purposes of petitioner, or petitioner's children or wife. Alexander G. McKenna treated the partnership interests owned by the three trusts of which he was trustee as trust property and in his activities as a partner he acted as trustee on behalf of the trusts. He had no understanding or agreement as trustee or otherwise with petitioner as to the conduct of the trusts. He had no understanding or supposition that petitioner was to receive any of the income or of the principal of any of the trusts. Petitioner never undertook to assert any control over Donald C. McKenna as adviser under any of the three trust agreements. No part of the income or corpus of any of the trusts was ever paid to the petitioner or used for his benefit or for the benefit of his wife or dependents. In his dealings as a partner Alexander G. McKenna and the other partners *133 considered that he represented an aggregate interest of 38 percent of which he owned 8 percent individually and 30 percent as trustee, and weight was given his views accordingly. Donald C. McKenna treated as his own property his 8 percent interest in the partnership and all money paid to him by the partnership. He received distribution ratably in accordance with his percentage interest in the partnership. He never spent any portion of it directly or indirectly for the benefit of petitioner. In the conduct of the business of the partnership capital was at all times a primary incomeproducing factor By an agreement entitled "Amended Partnership Agreement of McKenna Metals Company" dated November 14, 1941, effective December 1, 1941, the original partnership agreement was amended. On November 14, 1941, all of the parties executed an "Amended Certificate of Limited Partnership of McKenna Metals Company", which was on November 20, 1941, duly recorded. The amendment provided, inter alia, that the salaries permitted the general partners should be in "such amount as the partners may determine"; that all distributions and retained profits should be pro rata, the limited partner being *134 entitled only to his distributive rights without the powers or liabilities of a general partner, a provision of the original agreement requiring petitioner to devote his full time and skill to the partnership was deleted. The right was denied general partners to admit any additional limited partner. It was further provided that involuntary dissolution would take place on the termination of any of the three trusts, or the death, insanity or retirement of any partner; and that voluntary dissolution would take place upon notification by any partner to the other partners; that on liquidation the surviving owners of a majority in interest of the assets had the right to purchase the interests of other former partners at book value, no value to be ascribed, however, to good will, copyrights, trade-marks, and the right to use the partnership name, which was stated to be partnership property. The right to so acquire minority-interests was required to be exercised in 60 days and payment made within six months. After Sydney Edith McKenna died suddenly on December 1, 1942, the parties were advised by counsel that this event terminated the trust of Sydney Edith McKenna of which Alexander G. McKenna *135 was trustee and that thereby the partnership was dissolved. Accordingly, Alexander G. McKenna, as trustee, transferred to petitioner and his wife, as the intestate successors of Sydney Edith McKenna under Pennsylvania law, her 10 percent interest. For the month of December, 1942, the remaining partners continued to carry on the business, treating themselves as co-tenants. On December 31, 1942, effective as of January 1, 1943, a new agreement entitled "Partnership Agreement of McKenna Metals Company," was entered into between petitioner, Alexander G. McKenna, Donald C. McKenna, Dorothy C. McKenna, and Alexander G. McKenna, as trustee for Phillip Collins McKenna, and as trustee for Carol Elizabeth McKenna. Besides the absence of Sydney Edith McKenna trust as a partner, her interest increasing the interests of petitioner and Dorothy C. McKenna by 5 percent, respectively, under the new partnership agreement, Donald C. McKenna was a general partner and Dorothy C. McKenna was a limited partner. After the death of her daughter Dorothy McKenna became somewhat indifferent to the affairs of the partnership. It was also provided that salaries of the general partners were to be fixed, at the *136 "partners contributing a majority of the capital contributions may determine"; and on liquidation the option of the majority to buy out minority interests at book value was required to be exercised within sixty days. On January 6, 1943, the parties executed a "Certificate of Limited Partnership of McKenna Metals Company," prescribed by Pennsylvania law. It was duly recorded on February 1, 1943. On February 23, 1943, effective on and after January 1, 1943, the parties to the agreement executed a further amendment. An amended certificate was not thought necessary on advice of counsel. With reference to dissolution, this amendment provided that the right to purchase the minority interest was to be exercised within 120 days and payment therefor to be made periodically over a period of three years from the time of the exercise of such option to purchase, the liability for payment being represented by 5 percent promissory notes, payable before maturity at the option of the maker. Provision was also made for a revaluation of the minority interest if necessary by reason of liabilities or assets unknown or unascertainable at the time of the agreement. On June 25, 1943, Kennametal, Inc., was *137 incorporated under the laws of Pennsylvania. On June 30, 1943, the parties to the second partnership agreement executed and delivered to Kennametals, Inc., an instrument conveying and transferring to it all the assets and property of the partnership, excepting cash, accounts receivable and inventories, receiving in consideration therefor 25,000 shares of common capital stock which was issued to the members of the partnership in proportion to their interests therein. As part of the same transaction Kennametal, Inc., purchased the inventories of the business of McKenna Metals Company for which it gave its-demand note, payable to McKenna Metals Company in the amount of $764,886.71. In addition, Kennametal, Inc., borrowed $100,000 in cash for which it gave the partnership its demand note. McKenna Metals Company duly filed partnership income tax returns for the appropriate accounting periods failing between July 1, 1940, and December 31, 1943, reporting the income and deductions of the partnership and showing the distributive shares of the several partners in accordance with the applicable partnership agreements, and for the month of December, 1942, the appropriate proprietary interests *138 of the owners of the business. Each of the individuals and trustees who were parties to the original partnership agreement and the amendments thereto filed income tax returns for the calendar year 1941, in which there were included as taxable income and credits derived from a partnership named as McKenna Metals Company the amounts of partnership income and credits attributed to such taxpayer in the partnership returns of McKenna Metals Company for its accounting periods ending in 1941, except that Donald and Bernice McKenna each took one-half of the amount attributed to Donald C. McKenna. The income taxes shown on the returns were duly assessed and paid. Each of the individuals and trustees similarly filed income tax returns for the calendar years 1942 and 1943 (except that Alexander G. McKenna, as trustee for Sydney Edith McKenna, filed only for the period January 1 to December 1, 1942) in which there were included as taxable income and credits derived from a partnership named as McKenna Metals Company the amounts of partnership income and credits attributed to such taxpayer in the partnership returns, except that Donald and Bernice McKenna each reported one-half of the amounts *139 attributed to Donald C. McKenna. The income taxes shown due on such returns were duly assessed and paid except that in the case of individuals not trustees effect was given to the provisions of the Current Tax Payment Act of 1943. For the year 1941 the total withdrawals and, except as to Donald C. McKenna, the tax liability, the pro rata share of income attributable to the respective partners and the differences between their respective pro rata shares and their withdrawals and their pro rata shares and tax liability were as follows: Difference
Difference
Total
Between Pro
Between Pro
With-
Tax
Pro Rata
Rata Share &
Rata Share &
Partner
drawals
Liability
Share
Withdrawals
Tax Liability
Philip M.
$236,538.64
$296,200.97
$434,616.46
$198,077.82
$138,415.49
Dorothy
82,788.51
87,667.31
149,416.26
65,627.75
61,748.95
Alex., Trustee,
Sydney E.
59,134.66
58,353.33
106,725.91
47,591.25
48,372.58
Alex., Trustee, Carol E.
59,134.66
58,353.33
106,725.91
47,591.25
48,372.58
Alex., Trustee, Philip C.
59,134.66
58,353.33
106,725.91
47,591.25
48,372.58
Alexander
47,307.73
46,251.09
89,330.72
42,022.99
43,079.63
Donald
47,307.73
*140 Opinion Petitioner's cousin and brother made substantial and valid contributions of both capital and services to the family partnership. As to them we see no serious doubt in the genuine character of their participation, and if theirs were the only interest supplementary to that of petitioner himself, we should have no hesitation in sustaining the taxable division of partnership profits. Cf. respondent's determination in . The difficulty arises when we come to the 14 percent interest of petitioner's wife and the 36 percent aggregate of the shares placed in trust for his infant children, and the consequent necessity of placing this case in the context of , and , on the one hand, and , and , on the other. The trusts were concededly no more than gifts, and they were restricted, as the facts show, to the preconceived purpose of continued devotion to the business. The partnership *141 agreement purported to limit dissolution to the favorable action of 75 percent of the partnership interests, which would be impossible without the concurrence of petitioner's 40 percent, and to prohibit the withdrawal of undistributed profits until dissolution. Retention in the business, after the gifts exactly as before, was thus insured as long as petitioner should please. There was no pretext of the contribution of services by the daughters, and that of the son and wife were nominal as far as concerns any real business relationship. The wife's natural interest in the family enterprise was not satisfactorily shown to have consisted of services of any value. As we said in , "Her wifely interest in her husband's business as demonstrated by taking telephone messages at home is not sufficient to meet the statutory reference to 'carrying on a business.'" And the withdrawals of realized profits were designedly limited to the approximate amounts necessary to pay income taxes. Since these were obligations which petitioner would have been required to meet, in the absence of the transfers, since the respective dependents had no other *142 funds with which to pay these quasi-vicarious charges, and since they had, and were expected to have, virtually nothing for their own use after this disposal of the distributions, it in question, was permitted to filter through to the donees. Cf. . On the other hand, the control nominally exercisable by petitioner and the interest in the partnership property and income he retained was radically less than that in , in which respondent has now acquiesced. Internal Revenue Bulletin, September 11, 1944, p. 1. Petitioner was not, at least in form, the managing partner. His decisions could theoretically be thwarted by a concert of the other interests. He would succeed to no such substantial partnership assets upon dissolution, as would Scherer, and his right to bring that about was denied in terms by the partnership agreement. And as in , the partnership income was theoretically to be distributed among all the partners, and its disposition subject to the action of a majority of the votes of active partners, *143 which petitioner's share alone could not accomplish. It is true that in , we stressed the respondent's coincident determination of gift tax, and the consequent concession of the validity of the gifts for present purposes. But at the same time we noted the permissible practice of assuming inconsistent positions for the purpose of the presentation of cases. There is at any rate no reference to any formal demand by Scherer that respondent make an election, and none that any was consciously made. And, in addition, the respondent has determined a gift tax deficiency against this petitioner, and thus, to that extent at least, the cases are similar. Unless the gift tax phase of the Scherer opinion is emphasized to the exclusion of all other elements, it presents no stronger case for the taxpayer than this proceeding. Being unwilling to authorize inconsistent tax burdens in comparable situation, we accordingly disapprove the deficiency in its entirety on the authority of Decision will be entered under Rule 50.